The Liu Law Firm
Long Z. Liu, SBN 236815
Jason W. Lee SBN (SBN 237092)
1163 Fairway Drive, Suite 105
City of Industry, CA 91789
Telephone: (909) 468-2165
Email: office@theliulawfirm.com

*Attorneys for Plaintiff*,
DAVID D. LEE

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DAVID D. LEE, Individually and on behalf of all others similarly situated;<br><br>Plaintiff,<br>v.<br><br>NVIDIA CORPORATION, a corporation; JEN-HSUN HUANG, an individual,<br><br>Defendants. | **CASE NO:**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff David D. Lee ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his undersigned counsel, brings this Class Action Complaint against Defendants NVIDIA Corporation ("NVIDIA" or the "Company") and Jen-Hsun "Jensen" Huang ("Huang") (collectively, "Defendants").

Plaintiff alleges the matters concerning himself and his own transactions upon personal knowledge. All other allegations are made upon information and belief, based upon an investigation conducted by and through counsel, including a review of publicly available information, NVIDIA's filings with the United States Securities and Exchange Commission ("SEC"), corporate disclosures, press releases, public statements, financial and market information, and news reports concerning the Company and its management.

Plaintiff believes that additional evidentiary support for the allegations herein will be obtained following a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. Plaintiff David D. Lee brings this securities class action on behalf of investors who purchased or acquired NVIDIA Corporation securities between October 9, 2025 and November 8, 2026, inclusive (the "Class Period"), and sustained damages as a result of the conduct alleged below.

2. NVIDIA told investors that Jensen Huang's interactions with Megaspeed personnel were ordinary business dealings. But the Company did not tell investors about Huang's intimate relationship with Alice Huang, a Megaspeed executive. That was not a typical customer interaction. This case concerns what NVIDIA and Huang said when questions arose about those dealings—and what they left out.

3. Those questions were serious. Megaspeed was under scrutiny over whether its business could help Chinese entities obtain NVIDIA technology restricted by United States

export controls. NVIDIA publicly described its review of Megaspeed and explained Huang's contacts as part of his usual work with customers. Investors heard the business explanation. They did not hear about the alleged personal relationship.

4. The story did not end there. Later reports raised concerns that intelligence officials viewed Alice Huang as a suspected Chinese intelligence asset. Reports of a romantic relationship followed. On November 8, 2026, NVIDIA announced a Board investigation, and Huang acknowledged personal misconduct. NVIDIA's stock price fell on the next trading day, November 9, 2026.

5. Plaintiff alleges that the challenged statements caused NVIDIA securities to trade at prices that did not fully reflect the undisclosed information and that the subsequent disclosures caused at least some of that alleged inflation to dissipate, resulting in compensable losses to Plaintiff and other Class members.

6. Plaintiff seeks damages and other appropriate relief under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the “Exchange Act”), 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

## JURISDICTION AND VENUE

7. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

8. This Court has subject matter jurisdiction over this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

9. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). NVIDIA maintains its principal executive offices in

Santa Clara, California, within this District, and a substantial portion of the acts and omissions alleged herein occurred in or were directed from this District.

10. In connection with the conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including interstate communications, electronic communications, the United States mails, and the facilities of national securities exchanges.

**PARTIES**

11. Plaintiff David D. Lee ("Plaintiff") is an individual investor who purchased NVIDIA Corporation common stock during the Class Period. On November 25, 2025, Plaintiff purchased ten (10) shares of NVIDIA common stock at $172.39 per share, for a total purchase price of $1,723.90. Plaintiff continued to hold NVIDIA common stock during the relevant period. Plaintiff alleges that he suffered economic losses attributable to Defendants' alleged violations of the federal securities laws, as more fully described herein.

12. Defendant NVIDIA Corporation ("NVIDIA" or the "Company") is a Delaware corporation with its principal executive offices located at 2788 San Tomas Expressway, Santa Clara, California 95051.

13. NVIDIA is a publicly traded technology company engaged in the design and development of graphics processing units, artificial intelligence computing systems, and related technologies. Its products include advanced semiconductor technology subject to United States export restrictions, including restrictions governing the sale and transfer of certain products to China.

14. NVIDIA common stock trades on the NASDAQ Global Select Market under the ticker symbol "NVDA."

15. Defendant Jen-Hsun “Jensen” Huang (“Huang”) is NVIDIA's co-founder, President, and Chief Executive Officer and serves as a member of the Company's Board of Directors. Huang held these positions throughout the relevant Class Period and exercised substantial authority over NVIDIA's management, business operations, corporate strategy, and public communications.

16. By virtue of his senior executive position, Huang possessed the authority and ability to influence and control NVIDIA's business operations, corporate disclosures, and statements made to investors concerning the Company's relationships with customers, business partners, and entities involved in the distribution or use of its advanced semiconductor products.

17. During the Class Period, Huang personally participated in public communications concerning NVIDIA's relationship with Megaspeed International, including statements addressing the nature of that relationship and the Company's efforts to verify compliance with applicable export restrictions.

18. Plaintiff alleges that Huang knew, or recklessly disregarded, material information concerning his relationship with a Megaspeed executive that rendered certain public statements concerning NVIDIA's dealings with Megaspeed materially false or misleading.

19. Huang had the authority to review, approve, correct, or cause the correction of public statements concerning NVIDIA's business operations and relationships. Plaintiff alleges that Huang exercised control over the Company's relevant public communications and participated in the dissemination of the statements challenged herein.

20. At all relevant times, Huang acted within the scope of his authority as an officer and director of NVIDIA. Plaintiff alleges that NVIDIA is responsible for the actionable

statements and conduct of its officers, employees, and authorized representatives undertaken within the scope of their corporate responsibilities.

21. NVIDIA and Huang are referred to collectively herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### A. NVIDIA's Public Explanation of Its Megaspeed Dealings

22. NVIDIA develops and distributes advanced semiconductor technology, including artificial intelligence processors subject to United States export restrictions. The Company's relationships with customers and intermediaries operating internationally are therefore significant to its business operations and regulatory compliance.

23. In its July 2026 Quarterly Report on Form 10-Q, NVIDIA acknowledged business and reputational risks associated with the potential diversion of export-controlled products and compliance failures involving customers or business partners. NVIDIA further recognized that reports of such activities, even if unsubstantiated, could adversely affect its business and commercial relationships.

24. On October 9, 2025, *The New York Times* published an article entitled "A Mystery C.E.O. and Billions in Sales: Is China Buying Banned Nvidia Chips?" The article reported that United States government officials were investigating Megaspeed International ("Megaspeed"), a Singapore-based data center company, concerning its potential involvement in circumventing export restrictions on advanced NVIDIA semiconductor technology.

25. According to the article, Megaspeed was positioned to purchase approximately $2 billion in NVIDIA artificial intelligence technology. Government officials were reportedly examining whether Megaspeed's business operations could facilitate access to restricted NVIDIA products by Chinese entities.

26. The article identified Alice Huang, also known as Huang Le, as a Megaspeed executive who had interacted with Defendant Huang at an industry gathering in Taipei. It described an occasion on which Alice Huang arranged for Defendant Huang to meet with technology executives and customers.

27. Responding to the report, NVIDIA spokesperson John Rizzo said that the Company had examined Megaspeed’s ownership and operations, consulted United States government officials, and visited Megaspeed facilities. He stated that NVIDIA had found no evidence of unlawful diversion of its products to China.

28. Rizzo also explained that NVIDIA’s field teams commonly arranged meetings among executives, customers, and business partners at conferences and that Huang attended such meetings when his schedule permitted.

29. NVIDIA's answer was straightforward: Huang met with customers and business partners at industry events. The Company presented his contact with Megaspeed personnel as part of that ordinary practice.

30. But NVIDIA left out the intimate relationship alleged between Huang and Alice Huang. If that relationship existed when NVIDIA made its October 2025 statements, the interactions were not explained fully by routine customer meetings.

31. That distinction mattered. Megaspeed was already facing questions about export controls. NVIDIA was telling investors it had examined Megaspeed's operations. A personal relationship between NVIDIA's CEO and an executive connected to Megaspeed raised a different set of questions about judgment, conflicts, and oversight—questions the Company's explanation did not address.

32. The personal relationship does not, by itself, establish that NVIDIA's products were diverted unlawfully. The issue here is whether NVIDIA's account of Huang's interactions left investors with a misleading impression.

**B. Later Reporting Raises Questions About Huang's Personal Ties**

33. On October 29, 2026, *The New York Times* published an article entitled "Nvidia Chief Seen as Target of Chinese Spy Plot," reporting that United States intelligence officials had identified Alice Huang, also known as Huang Le, as a suspected Chinese intelligence asset.

34. According to the article, intelligence officials were investigating whether Alice Huang had provided information to the Chinese government and whether Megaspeed's operations facilitated access to NVIDIA semiconductor technology in violation of United States export restrictions.

35. The article further reported that Alice Huang had developed a close relationship with Defendant Huang, raising concerns among government officials regarding her access to NVIDIA's Chief Executive Officer and the potential national-security implications of that access.

36. The article described concerns regarding Megaspeed's acquisition and deployment of NVIDIA technology, including whether certain products had been diverted or made available to Chinese entities contrary to applicable export restrictions.

37. The October 29 article reported suspicions and intelligence concerns; it did not establish that Huang participated in espionage or that NVIDIA illegally diverted technology. Those allegations nevertheless made the nature of Huang's contact with Alice Huang an important part of the story.

38. When asked about Huang's interactions with Alice Huang, NVIDIA spokesperson John Rizzo stated: "Jensen's interactions with Ms. Huang are not unusual or unexpected."

39. Rizzo explained that meetings with customers were part of Huang's responsibilities as Chief Executive Officer and that Huang regularly interacted with numerous customer executives.

40. Once again, NVIDIA described Huang's contact with Alice Huang as routine CEO business.

41. But the alleged intimate relationship was missing from that answer. Huang's contact with Alice Huang was not simply another customer meeting if he was personally involved with her.

42. And the stakes were not limited to Huang's private conduct. Intelligence officials were reportedly scrutinizing Alice Huang, while Megaspeed faced questions about restricted technology. Investors evaluating NVIDIA's leadership and oversight were entitled to an accurate account of the interactions NVIDIA chose to discuss.

**C. Huang's Own Explanation of the Relationship**

43. On October 29, 2026, Defendant Huang participated in an interview with Bloomberg concerning NVIDIA's dealings with Megaspeed and the reported investigation involving Alice Huang. Bloomberg published its reporting on October 29 and updated it on October 30, 2026.

44. During the interview, Huang described NVIDIA's business relationship with Megaspeed as ordinary and proper, stating that the Company's dealings with Megaspeed were "normal and not unusual."

45. When specifically addressing his interactions with Alice Huang, Huang stated: “Our relationship, our interactions, have been related to Megaspeed, and it was all completely normal and not unusual.”

46. Huang further represented that NVIDIA had examined Megaspeed's deployment of its graphics processing units to determine whether the products had been unlawfully diverted to China. He stated: “We've studied all their deployments of our GPUs and counted every one.”

47. Huang told the public that his interactions with Alice Huang were about Megaspeed and were completely normal. He did not mention the intimate relationship alleged in this Complaint. That is the missing fact at the center of Plaintiff's challenge to his explanation.

48. Huang also said NVIDIA had reviewed Megaspeed's GPU deployments. His personal relationship does not establish that the deployment review was false. But his statements about NVIDIA's diligence formed part of the business-focused account he offered investors.

49. Huang was not speculating about someone else's conduct. He knew the nature of his own interactions with Alice Huang. Plaintiff alleges that he knew, or was deliberately reckless in disregarding, that leaving out the personal relationship made his explanation misleading.

50. Investors assessing NVIDIA's management, potential conflicts, and exposure to regulatory or reputational harm had reason to care about that information.

**D. Further Disclosures and the Market Response**

51. In the days following Defendants' October 29, 2026 statements, additional reporting raised questions concerning the nature of Defendant Huang's relationship with Alice Huang and the potential implications of that relationship for NVIDIA.

52. On November 6, 2026, the *Financial Times* reported allegations that Huang had maintained a romantic relationship with Alice Huang, who was reportedly suspected by United States intelligence officials of conducting intelligence activities on behalf of China.

53. By November 6, reports of a romantic relationship were already public. What followed on November 8 was different: NVIDIA announced an independent investigation, and Huang acknowledged personal misconduct.

54. On November 8, 2026, NVIDIA announced that its Board of Directors had initiated an independent investigation following reports that Huang had been the target of a foreign intelligence effort. The investigation would be overseen by independent directors assisted by outside counsel.

55. On November 8, 2026, the same day NVIDIA announced that its Board was initiating an independent investigation, the Board publicly stated: "While the Board has no reason to believe that either national security or NVIDIA secrets were compromised, the Board's inquiry will examine all available information." The Board was reassuring investors about the very risks its investigation was supposed to examine. The independent investigation had just been announced, yet NVIDIA was already telling investors there was no reason to believe national security or Company secrets had been compromised. This statement was significant because investors were trying to determine whether Huang's relationship with Alice Huang had exposed NVIDIA to national-security, regulatory, or corporate risks.

56. That same day, NVIDIA publicly released a communication from Huang to Company personnel in which he acknowledged that he had been unfaithful to his wife, apologized for his conduct, and expressed support for the Board's investigation. The communication did not identify Alice Huang by name or admit that Huang had knowingly participated in espionage or unlawful semiconductor diversion.

57. Contemporaneous reporting by *The New York Times* further stated that Huang had acknowledged to NVIDIA's Board an intimate relationship with Alice Huang. Unlike the earlier reports describing allegations concerning the relationship, the November 8 disclosures included Huang's own acknowledgment of personal misconduct and NVIDIA's decision to undertake an independent investigation.

58. Investors now had more than a company explanation of ordinary customer meetings. They had Huang's acknowledgment of personal misconduct, reporting connecting that acknowledgment to Alice Huang, and a Board investigation into the circumstances. Those developments brought questions about leadership, oversight, and conflicts into sharper focus.

59. On November 9, 2026, the first regular trading day following the November 8 disclosures, NVIDIA common stock declined by $7.97 per share, or approximately 4.27%, from its November 6 closing price of $186.64 to close at $178.67 per share. On November 10, 2026, the stock declined a further $9.78 per share, or approximately 5.47%, to close at $168.89. From the November 6 close of $186.64 to the November 10 close of $168.89, NVIDIA common stock declined $17.75 per share, or approximately 9.51%.

60. Plaintiff alleges that at least part of the November 9 decline reflected the new confirmation and NVIDIA’s response, rather than only information previously reported or unrelated market developments.

61. As a direct and proximate result of Defendants' alleged materially misleading statements and omissions, and the subsequent disclosure of information correcting those statements, Plaintiff and members of the proposed Class suffered economic losses and damages in amounts to be established through discovery and at trial.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

62. Plaintiff brings this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of all persons and entities who purchased or otherwise acquired publicly traded securities of NVIDIA Corporation between October 9, 2025, and November 8, 2026, inclusive (the "Class Period"), and suffered damages as a result of Defendants' alleged violations of the federal securities laws (the "Class").

63. Excluded from the Class are Defendants, NVIDIA's officers and directors during the Class Period, members of their immediate families, their legal representatives, heirs, successors, and assigns, and any entity in which Defendants have or had a controlling interest.

64. **Numerosity.** The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, NVIDIA common stock was actively traded on the NASDAQ Global Select Market under the ticker symbol "NVDA." Although the precise number of Class members is presently unknown and can be determined through discovery, Plaintiff believes that the proposed Class consists of thousands of investors who purchased or otherwise acquired NVIDIA securities during the Class Period.

65. The identities of Class members may be determined from records maintained by NVIDIA, its transfer agent, brokerage firms, and other financial institutions. Class members may be notified of the pendency of this action through procedures customarily employed in securities class actions.

66. **Commonality.** Questions of law and fact common to all members of the Class exist and predominate over questions affecting only individual Class members. These common questions include:

(a) Whether Defendants violated the federal securities laws through the acts and omissions alleged herein;

(b) Whether Defendants made materially false or misleading statements concerning NVIDIA's business relationships, compliance practices, and Defendant Huang's interactions with Megaspeed personnel;

(c) Whether Defendants omitted material facts necessary to make their public statements, in light of the circumstances under which they were made, not misleading;

(d) Whether Defendants knew or recklessly disregarded that their statements were materially false or misleading;

(e) Whether Defendants' alleged misrepresentations and omissions artificially inflated the market price of NVIDIA securities during the Class Period;

(f) Whether the subsequent disclosures concerning Huang's relationship with Alice Huang and NVIDIA's independent investigation caused the alleged artificial inflation to dissipate;

(g) Whether Plaintiff and the members of the Class suffered economic losses as a result of Defendants' alleged violations of the federal securities laws; and

(h) The appropriate measure of damages sustained by Plaintiff and the Class.

67. **Typicality.** Plaintiff's claims are typical of those of the proposed Class because Plaintiff alleges that he purchased NVIDIA securities during the Class Period at prices artificially inflated by the same materially false and misleading statements and omissions that affected other Class members. Plaintiff's claims arise from the same alleged course of conduct and are based upon the same legal theories applicable to the Class.

68. **Adequacy.** Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff's interests are aligned with those of the proposed Class, and Plaintiff is not aware of any interests antagonistic to those of other Class members. Plaintiff intends to prosecute this action vigorously through counsel qualified to conduct complex securities litigation.

69. **Predominance.** Questions of law and fact common to the Class predominate over questions affecting individual Class members. Defendants' alleged misconduct involved public statements and omissions directed toward the investing public generally, and the principal issues concerning materiality, scienter, market efficiency, loss causation, and damages are susceptible to proof through evidence common to the Class.

70. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The prosecution of separate actions by individual investors would impose unnecessary expense and burden on the parties and the judicial system and could result in inconsistent determinations concerning Defendants' alleged conduct. Class treatment will promote judicial economy and provide an effective mechanism for resolving the claims of investors whose individual losses may be insufficient to justify separate litigation.

**Reliance Upon the Integrity of the Market**

71. Plaintiff will rely, in part, upon the presumption of reliance recognized under the fraud-on-the-market doctrine. Throughout the Class Period, NVIDIA common stock traded on the NASDAQ Global Select Market, an established national securities exchange.

72. Plaintiff alleges that NVIDIA common stock traded in an efficient market during the Class Period, as demonstrated by, among other things:

(a) NVIDIA common stock was actively traded on the NASDAQ;

(b) NVIDIA securities were the subject of substantial analyst coverage and financial reporting;

(c) Information concerning NVIDIA's business operations, financial performance, management, and regulatory risks was publicly disseminated through SEC filings, corporate announcements, financial news publications, and other market communications;

(d) NVIDIA common stock was traded by institutional and individual investors in substantial volume; and

(e) Material information concerning NVIDIA was incorporated into the market price of its publicly traded securities.

73. As a result of the foregoing, Plaintiff alleges that the market price of NVIDIA common stock reflected publicly available information concerning the Company, including Defendants' allegedly materially false and misleading statements and omissions.

74. Plaintiff and the members of the Class purchased or otherwise acquired NVIDIA securities during the Class Period without knowledge of the material facts allegedly concealed by Defendants and relied upon the integrity of the market price in making their investment decisions.

75. Plaintiff alleges that Defendants' materially false and misleading statements and omissions caused NVIDIA securities to trade at artificially inflated prices during the Class Period. Plaintiff and the members of the Class are therefore entitled to invoke the rebuttable presumption of reliance recognized under the fraud-on-the-market doctrine.

76. Alternatively, to the extent Plaintiff's claims are based upon material omissions for which Defendants had a duty of disclosure, Plaintiff and the members of the Class invoke the presumption of reliance recognized in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), to the extent applicable.

77. Plaintiff alleges that the requirements of Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure are satisfied and that this action is appropriate for certification and adjudication as a class action.

**COUNT I**

**Violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5**

**(Against All Defendants)**

78. Plaintiff repeats and realleges each of the preceding paragraphs as though fully set forth herein.

79. This cause of action is asserted against Defendants NVIDIA Corporation and Jen-Hsun "Jensen" Huang pursuant to Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) and Rule 10b-5(b) promulgated thereunder (17 C.F.R. § 240.10b-5(b)).

80. Defendants told investors that NVIDIA's Megaspeed dealings and Huang's interactions with Alice Huang were ordinary business matters. Plaintiff challenges the October 2025 and October 2026 statements identified above because those explanations allegedly omitted Huang's intimate personal relationship with Alice Huang.

81. In October 2025, NVIDIA spokesperson John Rizzo described the Company's review of Megaspeed and explained Huang's contacts with Megaspeed personnel as ordinary customer interactions. If Huang's intimate relationship with Alice Huang existed at that time, that explanation left out a fact directly relevant to the interactions NVIDIA was describing. Plaintiff David D. Lee purchased ten shares of NVIDIA common stock on November 25, 2025.

82. In October 2026, Huang described his own interactions with Alice Huang as related to Megaspeed and as normal and not unusual. He did not disclose the alleged intimate relationship. Plaintiff alleges that this omission made his business-only explanation materially misleading.

83. The relationship mattered because investors were evaluating NVIDIA's leadership, its dealings with a company facing export-control scrutiny, and the possibility of conflicts or regulatory and reputational harm. Plaintiff alleges that a reasonable investor would have considered the missing information significant.

84. Huang knew the nature of his own relationship with Alice Huang. Plaintiff alleges that he knew, or acted with deliberate recklessness as to whether, his public explanation was misleading without that information. Plaintiff relies on Huang's personal participation in the relationship, his statements about it, and the later reported acknowledgment in support of this allegation.

85. NVIDIA made the challenged corporate statements through authorized representatives speaking on its behalf. Plaintiff alleges that those statements concerned the Company's customer relationships and management. Whether the requisite knowledge or deliberate recklessness is attributable to NVIDIA depends on the individuals responsible for the particular challenged communications.

86. Defendants' materially misleading statements and omissions were made in connection with the purchase or sale of NVIDIA securities and were disseminated to the investing public through established financial-news publications and other channels of interstate commerce.

87. Plaintiff alleges that the challenged statements and omissions inflated or maintained inflation in NVIDIA's market price. On November 25, 2025, after the October 2025 statements, David D. Lee purchased ten shares of NVIDIA common stock. Plaintiff alleges that the purchase price reflected the challenged statements and invokes the applicable presumption of reliance on the integrity of the market price. The October 2026 statements are alleged as subsequent statements in the same course of conduct, not as statements preceding Lee's purchase.

88. Reports alleging a romantic relationship appeared before November 8, 2026. On November 8, NVIDIA announced a Board investigation, Huang acknowledged personal misconduct, and contemporaneous reporting identified Alice Huang as the person involved.

89. Plaintiff alleges that those developments added materially to what investors previously knew and corrected, at least in part, the impression created by Defendants' earlier explanations. NVIDIA shares declined $7.97, or approximately 4.27%, on November 9, 2026, closing at $178.67. On November 10, 2026, the stock declined a further $9.78 per share, or approximately 5.47%, to close at $168.89. From the November 6 close of $186.64 to the November 10 close of $168.89, NVIDIA common stock declined $17.75 per share, or approximately 9.51%.

90. Plaintiff alleges that the corrective information contributed to the November 9 decline and caused economic loss. He seeks only damages attributable to the correction of the challenged statements, not losses caused by unrelated market events or information already public.

91. By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b). Plaintiff and members of the Class seek compensatory damages for economic losses caused by those violations, in amounts to be established through the evidence and subject to applicable statutory limitations.

**COUNT II**

**Violation of Section 20(a) of the Securities Exchange Act of 1934**

**(Against Defendant Jen-Hsun "Jensen" Huang)**

92. Plaintiff repeats and realleges each of the preceding paragraphs as though fully set forth herein.

93. This cause of action is asserted against Defendant Jen-Hsun "Jensen" Huang pursuant to Section 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. § 78t(a)).

94. During the Class Period, Huang served as NVIDIA's co-founder, President, Chief Executive Officer, and a member of its Board of Directors. By virtue of these positions,

Huang possessed substantial authority over NVIDIA's management, business operations, corporate strategy, and public communications.

95. Huang possessed the power to direct, influence, and control NVIDIA's policies and practices concerning its commercial relationships, compliance procedures, and communications with investors and the public.

96. As alleged herein, Huang personally participated in public communications concerning NVIDIA's relationship with Megaspeed International, including his October 29, 2026 interview addressing the Company's dealings with Megaspeed and his interactions with Alice Huang.

97. Huang's personal participation in these communications, together with his executive authority, demonstrates his involvement in the subject matter of the challenged representations and his ability to influence NVIDIA's public explanations concerning its commercial relationships and management.

98. Plaintiff alleges that Huang exercised actual control over NVIDIA's relevant corporate activities and possessed the authority to direct, approve, or cause the correction of public communications concerning the Company's dealings with Megaspeed and his interactions with its personnel.

99. As alleged in Count I, NVIDIA committed a primary violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) by making materially misleading statements and omissions concerning Huang's interactions with Alice Huang and the nature of the Company's explanations of those interactions.

100. By reason of his authority over NVIDIA's operations, his involvement in the matters giving rise to the challenged statements, and his ability to influence and control the

Company's relevant public communications, Huang was a controlling person of NVIDIA within the meaning of Section 20(a) of the Exchange Act.

101. As a direct and proximate result of NVIDIA's alleged primary violation of the federal securities laws, Plaintiff and members of the Class suffered economic losses and damages in amounts to be established at trial.

102. Accordingly, Plaintiff alleges that Huang is liable as a controlling person pursuant to Section 20(a) of the Exchange Act for damages resulting from NVIDIA's underlying violation of Section 10(b) and Rule 10b-5(b), subject to the defenses and limitations provided by applicable law.

## COUNT III

## Violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5

## (Against Defendant NVIDIA Corporation)

103. Plaintiff repeats and realleges each of the preceding paragraphs as though fully set forth herein.

104. This cause of action is asserted against Defendant NVIDIA Corporation pursuant to Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5

105. On November 8, 2026, NVIDIA’s Board of Directors publicly stated that it had “no reason to believe that either national security or NVIDIA secrets were compromised,” while at the same time announcing that it was initiating an independent investigation into reports that CEO Jensen Huang had been the target of a foreign intelligence effort.

106. The Board’s statement was a statement of opinion. A statement of opinion is actionable when it omits material facts about the basis for the opinion that conflict with what a reasonable investor would understand from the statement. Omnicare, Inc. v. Laborers Dist.

Council Constr. Indus. Pension Fund, 575 U.S. 175, 188–90 (2015). The Ninth Circuit applies this standard to claims under Section 10(b) and Rule 10b-5. City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc., 856 F.3d 605, 615–16 (9th Cir. 2017).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff David D. Lee, individually and on behalf of all others similarly situated, respectfully requests that judgment be entered in his favor and against Defendants as follows:

A. Determining that this action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying the proposed Class, appointing Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

B. Awarding Plaintiff and the members of the Class compensatory damages in an amount to be established at trial, together with interest thereon, for losses sustained as a result of Defendants' violations of the federal securities laws;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in prosecuting this action, including attorneys' fees and expert fees to the extent authorized by applicable law;

D. Awarding prejudgment and postjudgment interest to the extent permitted by law; and

E. Granting such other and further relief as the Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: November 10, 2026

**THE LIU LAW FIRM**

______________________________

**LONG Z. LIU**
*Attorney for Plaintiff David D. Lee*